Fabricant, Judith, J.
INTRODUCTION
This action arises from a conflict in the market for location position systems for use in mobile devices based on the Android operating system. Plaintiff Sky-hook Wireless, Inc. (Skyhook), and defendant Google, Inc. (Google), both offer such systems to device manufacturers, who install them into their devices before marketing the devices. Skyhook alleges that Google *418 improperly influenced two such manufacturers, Motorola Mobility, Inc. (Motorola), and Samsung, Inc. (Samsung), not to install Skyhook’s system. Based on that allegation, Skyhook claims intentional interference with contractual and advantageous business relations, and violation of G.L.c. 93A. Before the Court is Google’s motion for summary judgment on all counts of Skyhook’s complaint. For the reasons that will be explained, Google’s motion will be allowed.
BACKGROUND
The evidentiary materials submitted in connection with the present motion, considered in the light most favorable to the plaintiff as the non-moving party, provide the following factual background.[1] See G.S. Enters., Inc. v. Falmouth Marine, Inc., 410 Mass. 262, 263 (1991).
Google is a Delaware corporation with its principal place of business in Mountain View, California. Sky-hook is a Delaware corporation with its principal place of business in Boston. Motorola, which has its headquarters in Illinois, and Samsung, which is based in Korea, both manufacture mobile devices, including so-called smart phones. Such manufacturers are sometimes referred to as original equipment manufacturers, or OEMs.
In 2008, Google launched Android, a so-called “open source” operating system for mobile devices. “Open source” means that the source code for the Android operating system is publicly available, so that any developer can use, alter, and redistribute it. In this manner, developers unrelated to Google create and publicly distribute applications for use on Android-based devices. Users can download such publicly-distributed applications using Google software known as the “Android Market.” Users of Android devices thus have access to a large and diverse pool of applications written for the Android operating system,- including applications developed by Google itself and by others. Although the Android source code is public, the Android trademark, and related trademarks, are not; Google owns them and controls their use.
Along with the operating system, Google has developed a set of applications known as Google Mobile Services (GMS). Among those applications is Google’s location system, known as Google Location Services (GLS).[2] A location system on a mobile device provides the latitude and longitude coordinates for the location where the device, and presumably its user, is located, and then utilizes a function known as “reverse geocoding” to translate coordinates into readable street addresses and place names. Through the use of a location system an end user can find out his or her own location, as well as the location of nearby objects, persons, or attractions, such as lodging facilities, restaurants, entertainment, venues, gas stations or hospitals. In addition, commercial establishments such as restaurants and movie theaters can use location systems to deliver discount coupons and other marketing materials to potential customers located nearby.
Along with providing location data to the user and to potential advertisers, location systems also collect location data from the device and return the data to the software provider, which incorporates the data thus retrieved into its database, which it in turn uses for operation of the location system as well as for advertising and other purposes. As will be discussed further infra, both Google’s and Skyhook’s location systems retrieve data in this manner. Both companies consider such data retrieval, and the accuracy of the data retrieved, critical to the maintenance and improvement of their location databases.
Location systems on mobile devices obtain positioning data from one or more of three sources: (1) global positioning satellites (GPS); (2) wi-fi access points; and (3) cellular, tower triangulation. GPS is the most accurate of the three, but can be slow, and does not work well in dense, populated areas, or indoors. Cellular tower triangulation is less accurate, but works well indoors and outdoors. The wi-fi method draws on a manually-compiled database of wi-fi access points in populated areas; it transmits data from those points to the software maker’s location database, and then translates the data into latitude and longitude coordinates.
Google’s GLS includes Google’s GPS provider, which utilizes satellite data, and Google’s Network Location Provider (NLP), which utilizes data from wi-fi access points and cellular tower triangulation, and which also provides reverse geocoding. As indicated supra, NLP also retrieves data from the device, which Google incorporates into its database.[3] Google considers differentiation between satellite data and network data essential to the reliability of its database.
Motorola and Samsung manufacture, market and distribute mobile devices. Before any of the events in issue here, Google had entered into contracts with each of these manufacturers, authorizing them to use the Google-owned Android trademarks, and to preload the GMS set of Google applications onto their devices, subject to specified conditions.[4] Among those conditions is that devices marketed under Android trademarks and including Google applications must be “Android compatible”; that is, they must meet standards set forth in Google’s “Android Compatibility Program.”
The contracts reserve to Google the right to set compatibility standards and to change them at any time, applying such changes to any new device until the device is launched. For the purpose of compatibility testing, Google publishes a Compatibility Test Suite (CTS), which provides an objective test for compatibility, as well as a document referred to variously as the Android Compliance Document (ADD), or the Compliance Definition Document (CDD), which sets forth additional requirements.[5] In consultation with OEMs, *419 Google drafts and issues a new CDD for each new version of Android. In addition to the CTS and the CDD, Google drafts and publishes a document known as the Software Development Kit (SDK), to assist third-party developers in creating new applications for use on Android devices. The CDD incorporates the SDK by reference. The CTS, CDD, and SDK are all publicly available on the internet.
One of the requirements, set forth in the CDD, at section 3.1, is that “implementations MUST NOT omit any managed API’s (application programming interfaces], alter API interfaces or signatures, or deviate from the documented behavior.”[6] The SDK informs developers that the GPS provider “determines location using satellites,” and that the NLP “determines location based on availability of cell tower and WiFi access points."
Google grants or refuses to grant certification of compatibility for new devices based on results of testing with the CTS, and conformity with the CDD. Testing for compatibility is usually done by OEMs, rather than by Google, although Google does testing and evaluation of devices when it has identified or been informed of a compatibility issue. Denial of certification does not prevent the manufacturer from using the Android operating system, but it does prevent the manufacturer from marketing the device using Android trademarks, and from including Google’s applications. Devices based on the Android operation system without those advantages are effectively unmarketable.[7]
Google’s contracts with Motorola and Samsung each include the following additional provision, as §2.5, referring to the equipment manufacturer as “Company”:
Accurate Reproduction. Company agrees that in connection with its exercise of the right granted in Section 2.1 of the Agreement, it will accurately reproduce the Google Applications (including any legal notices and marks contained therein) and will not insert into the Google Applications any viruses, worms, date bombs, time bombs, or other code that is specifically designed to cause the Google Applications to cease operating, or to damage, interrupt, allow access to or interfere with any Google Applications or End User data.
From Google’s point of view, these provisions, in combination, guarantee it that devices marketed under the Android trademarks and with its applications will operate those applications in their full and intended form, without any alteration or deviation. That guarantee protects the expectations of users and third-party developers that applications developed by third-party developers will operate consistently on all Android devices. It also protects Google’s direct interest in full and accurate operation of the data retrieval functions of its own applications.
Skyhook has developed a location service known as XPS. XPS is a hybrid system, in that it integrates location data from all three sources: GPS, wi-fi, and cellular tower triangulation. Through this approach, XPS achieves a faster “time-to-first-fix” than other systems.[8]
In September of 2009, Skyhook entered into a contract with Motorola, subject to Illinois law, under which Motorola agreed to incorporate XPS into its Motorola Android Platform (MAP) devices, scheduled for launch in mid-July 2010. The contract provided that XPS would be the only software on the device that would collect and transmit positioning data back to the software maker. The contract also provided, however, that Motorola’s use of XPS would be subject to its pre-existing contractual obligations to third parties — that is, to Google, as well as to service carriers. Section §3.1(a) of the Skyhook-Motorola contract reads, in pertinent part:
Motorola shall pre-load the Embedded Software on all Wireless Devices with MAP . . . except: (i) those MAP Wireless Devices where Motorola is contractually prohibited by a qualified third party ... a “qualified third party” shall mean... (2) a certifying entity which has the right to define and approve the technical specifications to be a [sic] Android-compliant device and which has declared the Embedded Software to be non-compliant.
Over a period of several months after execution of their contract, Skyhook and Motorola personnel disT cussed questions of Android compatibility both within each company and between the two. The concern both companies identified was that XPS would, cause the Motorola device to violate the prohibition, quoted supra, against causing an API to “deviate from documented behavior,” in that XPS would report location results from both GPS and network sources through the GPS provider. As Skyhook and Motorola personnel both recognized, such reporting would give the false appearance that all the results derived solely from satellite sources, and met the level of accuracy expected of GPS data.[9] Motorola made clear to Skyhook that, in the words of an internal Motorola memorandum, “[GJoogle is the final arbiter and that we could not risk Google stopping shipment.”
Motorola’s internal communications reflect its concern about compatibility as late as March of 2010.[10] During that month, however] specifically in an email on March 8, 2010, Skyhook suggested that Motorola “evaluate the Qualcom solution for a similar violation.” Following up on that suggestion, Motorola satisfied itself, in the words of an internal email on April 4, 2010, that “we have proof of other devices (like Nexus-One) who are using the GPS channel in the same way and have passed all Googles certification." The “proof” referred to, according to the deposition testimony of Motorola’s Sue Forbes, was representations from Sky-hook. [11] On that basis Motorola personnel set aside *420 their concern about compatibility. Google, during this entire period, had no knowledge of these discussions between Motorola and Skyhook; indeed, it had no knowledge of any arrangement between those two companies, or of any plan by Motorola to install Skyhook’s XPS on Motorola’s devices.
Meanwhile, on April 1, 2010, Skyhook entered into a contract with Samsung, subject to California law, under which Skyhook licensed Samsung to install XPS in its devices. Skyhook’s contract with Samsung did not obligate Samsung to do so. Neither Skyhook nor Samsung announced the arrangement publicly, or informed Google of it.
Under the Motorola-Skyhook contract, Skyhook was required to obtain Motorola’s advance written approval before referring to Motorola’s choice of Skyhook’s software in any advertisement or publication. On April 21, 2010, Motorola approved a draft press release regarding the contract that did not include any mention of Google. Nevertheless, on April 26, 2010, Skyhook sent an email to press outlets with the subject line “Motorola to replace Google with Sky-hook.” The email stated that “Motorola is the first Android device maker to abandon Google for its location services.” Motorola personnel, as described in deposition testimony of both Skyhook and Motorola personnel, were “livid” and “furious.” Motorola demanded that Skyhook retract or amend its press briefing, but Skyhook refused.
Resulting press coverage was the first Google heard of Motorola’s plan to use Skyhook’s location service. The news set off a fluny of internal communications, in which Google personnel expressed alarm, particularly with respect to the prospect of losing the opportunity for data collection through Google’s location system.[12] One Google team member commented that the news was “devastating, especially since data collection is key to improvements.” Another wrote that, “It’s sad to see first Apple, and now Motorola moving away from us, which means less collection for us.” Another wrote, “I don’t believe we’ve made an improvement to accuracy in a year and a half for wifi or cell tower. So, the only way we would’ve closed the gap on Skyhook is if they got worse, which is unlikely.” In an email the following day, the same individual wrote that, although he believed that Google location services had beaten Skyhook in a recent test of accuracy,
[t]he risk we face is if Skyhook creates a perception in the industry that they are way better, then more and more partners will switch to them without doing much testing and due diligence themselves, and that would be awful for Google, because it will cut off our ability to continue to collect data to maintain and improve our location database. If that happens, we can easily wind up in the situation we were in before creating our own location database and that is (a) having no access at all or (b) paying exorbitant prices for access.
Representatives of Google and Motorola met in California on May 7, 2010. As a result of the discussion at that meeting, Google came to understand that XPS would report data from multiple sources through Google’s GPS provider, so that results from non-GPS sources would appear as GPS results. Google’s engineer characterized that as a “data contamination” issue.[13] Also at the May 7, 2010, meeting, Google and Motorola discussed Motorola’s intention to install Google’s NLP, even while using XPS, because Motorola needed NLP for its reverse geocoding function, which XPS did not offer. Google made clear to Motorola that it would not permit Motorola to include NLP in anything other than its complete form, with its data collection function fully operational. In a subsequent internal document summarizing the meeting, Google personnel indicated that their most pressing concern was how Motorola intended to address the contamination problem, both in the soon-to-be-shipped devices and in the long term. Google considered the problem so serious as to warrant blocking shipment of devices that were pre-loaded with XPS.
Google personnel discussed their concerns and options in a series of internal e-mails after the meeting. One member of the team asserted that Google “will be able to block Motorola from shipping the device if the contamination issues isn’t fixed,” and that Google would suggest to Motorola that it remove Skyhook until Motorola could “implement a correct hybrid solution.” The same communication indicated that Google would insist that “Skyhook must be treated as a network provider not a GPS provider. The GPS provider must provide a true GPS fix,” and that “NLP cannot be used for reverse geocoding unless NLP is the exclusive location provider.”
Discussions between Motorola and Skyhook followed. Skyhook proposed that Motorola disable NLP’s data collection function in areas covered by XPS. Motorola recognized that that would not solve the problem, since Motorola needed the reverse geocoding function of NLP, which Google would not permit Motorola to use without full operation of the data collection function. Motorola, according to an internal email dated May 13, 2010, “made it very clear on our call with Skyhook that Motorola will not ship a device that breaks the developer community and can not ship a device that Google does not approve.”
An internal email among Google personnel on May 18, 2010, reflects further discussion with Motorola, in which Motorola indicated that it “would like to continue to use both Skyhook and [NLP]. . . which would result in Google being used for reverse geolocation, etc. They have proposed to fix the technical issues identified (no longer feed Skyhook data as an input to GPS Provider). Skyhook would be hardcoded as the location provider in specific regions . . . but they are not pursuing a true hybrid solution to look up both Google and Skyhook and choose location info based on cov *421 erage/accuracy dynamically.” The internal Google email goes on, “We do not have anything in the contract today around the usage of NLP. We license our apk’s with the intention that the apk’s are installed and used in full.”[14] Google recognized, however, that it could not block shipment of the Motorola devices based on inclusion of an alternative location provider; although it could do so based on incompatibility.[15]
Discussions proceeded through late May 2010, between Motorola and Google. An internal Motorola email dated May 25, 2010, described Google’s “bottom line" position as that “ ‘Contamination’ is a compatibility issue and ‘Reverse Geo-coding’ is a contractual issue.” Google’s technology manager elaborated on the compatibility issue in an email to Motorola dated May 27, 2010. Citing section 3.1 of the CDD, set forth supra, he pointed out that Android documentation “clearly calls out that the GPS_Provider ‘determines location using satellites,’ ” so that developers expect to receive the level of accuracy that GPS provides, “for cases where they need a veiy fine grained location, such as a turn-by-tum navigation. Delivering an alternative solution that does not deliver GPS locations is not a compatible solution.” He went on,
Just to be clear, we are definitely not asking you to remove Skyhook from your solution. If you feel it improves, the UX[16] on your devices and if we can do that in a compatible way, but all means let’s do it! Our ask is that you not provide network-derived location data (from Skyhook, Google or anyone else) that is advertised as GPS location data . . . You should separate out the Skyhook implementation into a separate location provider so as not to confuse 3rd party developers and users . . . While we of course prefer that you use our NetworkLocation Provider, it would be ok (according to our current contract anyway) to set Skyhook LocationProvider implementation as the default version . . . We are not ok with you disabling Google’s NetworkLocationProvider, but if it is enabled and accessible as one of the available providers ... we’re ok. Again, reverse geo-coding is an expensive operation for us, and we are charging nothing for the NetworkLocationProvider. We need to have some means to improve the service for all users (and you as you use the reverse-geocoding implementation!).
The issue soon reached higher levels in both companies, with telephone and email communication between Google’s Andy Rubin, who had overall responsibility for Android, and Motorola’s CEO. In an email on May 28, 2010, Rubin asked for an update “on the wifi location being reported at gps.” He went on, “This is a stop ship issue and I want to make sure there aren’t any last minute surprises.” Motorola, according to an internal email, “put the request into Skyhook to make the necessary changes to their architecture,” but expected that Skyhook would not be able to do so in time for the earliest scheduled shipment. The email commented further,
Skyhook is taking a very legal stance so they may choose not to respond to our request... Depending on their response we will go back to Google to resolve the stop ship. Our contract is very clear with Skyhook in that if their sol[utio]n fails to pass Google CTS & ACD then we are not obligated to include their sol[utio]n. We have ensured that it is very easy to switch off the capability on the build that is currently going through lab and that will be the back up if this isn’t resolved.
Meanwhile, Motorola conducted testing of the NexusOne device in an unsuccessful attempt to confirm the representations it had received from Skyhook back in March. An internal Motorola email on May 29, 2010, described that result as “calling into question whether there are other approved Android devices that report non-GPS information via this interface.” The same email went on,
Depending on Skyhook’s response, this could create significant risk in our ability to ship devices and we’ve informed Skyhook that this is an unacceptable outcome.
Skyhook requested that Motorola not load any Google applications that collect data or get Google to agree to either disregard location information gathered from Motorola phones or change their applications to not collect data, citing a provision in the commercial agreement that we not distribute a competitive solution. We reviewed the Skyhook agreement, and this provision is only valid if it is not otherwise excluded by [contractual rights of another]. We shared this with Skyhook and also made it clear that Motorola has sold-in Google Maps and other GMS applications as part of the value proposition of our devices, and had agreed with Skyhook in previous discussions that we must include the Android NLP since it provides reverse geo-coding services to applications and we cannot fragment the developer ecosystem.
Internal emails at Google reflect that its highest level executives became aware of Motorola’s relationship with Skyhook at about this time, and inquired as to the implications for Google. That triggered the following, in an email from a member of the Android team:
We absolutely do care about this because we need wifi data collection in order to maintain and improve our wifi location service . .. Motorola is planning to distribute both Skyhook and Google location service (NLP) on their phones but they’ll only use Google as a backup. Since Skyhook has good coverage this means we’ll see little traffic (and, very little data collection). Motorola still plans to use the reverse geocoder portion of NLP which costs Google *422 money, so we are not happy about losing out on the data collection yet still have to pay the cost. We are revising our GMS contracts to avoid any confusion of this with partners in the future. Motorola also implemented this in an extremely strange way in which their GPS provider will return Skyhook wifi locations which would pollute our (or anyone else’s) data collection. We are requesting they fix this before approval of their devices for launch.
Skyhook and Motorola discussed the compatibility issue in a series of email exchanges in early June 2010. In an email on June 2, 2010, Motorola passed on language from a Google email identifying the problem as deviation from the documented behavior of the GPS provider. Motorola went on: “As such, Motorola needs to understand whether Skyhook is willing to change the implementation in a manner that would enable Motorola’s Android devices to remain Android Compatible, as well as the timeline for any such changes. Given the urgency, a response within the next 24 hours is appreciated so that Motorola can determine how to proceed with our imminent product launches.”
Skyhook responded, by email the same date, that it “is willing to make changes that are necessary in order to get into Android compliance,” and that a staff person was “scoping this now and will respond to you within 24 hours with the time estimate.” In the same email, Skyhook asked, “Is there any news on the issue of Google collecting data on Motorola devices (which they are prohibited from doing in section 3.1 ... of our agreement). Have they agreed to not collect this data?” On June 3, 2010, Skyhook reported to Motorola that it would provide “a modified version of XPS that only reports locations determined using satellites through the GPS location provider by the end of the week (Fri June 4th).” Motorola responded that, once it received the modified version, it would “work with Skyhook to understand the changes that have been made, ensure that they work properly on our devices, address any issues, retest, and resubmit for certification. Given our committed timeline to our customers, however, Motorola has no choice but to initially launch products that does not include the Skyhook technology. Motorola will, however examine whether a compliant version of XPS can be included in Motorola’s planned operating system upgrade plans for these devices.”
On June 4, 2010, Skyhook did provide a modified version, which it indicated would report only satellite-determined locations through the GPS provider. In an email of the same date, Skyhook asserted its position that “we cannot accept your statement below that we are non-compliant,” and demanded “formal and sufficient documentation from Google contending that our software is non-compliant and the specific provisions of the CTS and CDD that they reference in making that claim. Until then we will continue to perform as we have committed to under the agreement and expect that Motorola will do the same as we both pursue the spirit, intent and obligations under the agreement — to embed Skyhook in all AP-enable devices.” The email went on to emphasize that the terms of the agreement between Skyhook and Motorola were confidential and “not to be disclosed to any third party — to include Google.” Motorola initiated testing of the revised version of XPS, but did not at that time notify Google of the revision, and did not then or ever transmit the revised version to Google for testing. Neither did Sky-hook.
As of June 10, 2010, Motorola had removed XPS from its devices. Nevertheless, according to the deposition testimony of Motorola’s Android project manager, Motorola still wanted to use XPS. An internal Motorola document of that date indicates that Google had “provided official notice that Skyhook’s implementation is not compliant with [CDD],” and that, “As such, Skyhook’s XPS technology has been removed from immanent (sic) product launches and Skyhook notified of issue. Working with Skyhook on remedy as well as address Skyhook’s request to either remove all GMS applications that share location data with Google or ask Google to reject all location data that is collected from Skyhook-enabled Motorola phones.”
An email from Skyhook to Motorola dated June 14, 2010, recounts a telephone conversation on June 10, 2010, in which Motorola “said that Skyhook is not currently shipping on the Motorola Android Platform” because “Google had officially determined that Skyhook’s platform is noncompliant with Android.” The email also recounts discussion of the issue of “the contractual prohibition to ship with other software or applications that collect data for competing location systems.” According to Skyhook’s email, Motorola had reported that “Motorola’s carrier customers are requiring Motorola to ship Google applications,” which “do collect data and that Google will not refrain from collecting data on Motorola devices.” Skyhook’s email demands documentation both of a formal ruling of noncompliance from Google, and of carrier requirements, “otherwise we have no choice but to hold Motorola to its contractual obligation to include Sky-hook in every MAP-enabled device.”
On June 15 and 16, 2010, during meetings between Samsung and Google in Korea, Google learned that Samsung was including XPS in certain of its devices which Google had already approved, marketed in two European countries under the name “Galaxy S.”[17] In an internal email among Google personnel on June 15, 2010, a Google manager commented, “[t]hey changed this code without any notification to Google.” Samsung confirmed that the XPS operated on the Samsung device in the same manner as on the Motorola device, which confirmed for Google that the device had the same potential for contamination of Google’s database by returning network location information as if it were GPS information.[18] Google expressed to Samsung *423 that it considered the matter a serious problem, and Samsung agreed to work on a modification to address the problem, with an anticipated September date.[19] Google next communicated to Samsung on the subject with an email dated June 17, 2010, the contents of which were nearly identical to Google’s email to Motorola of May 27, 2010: Google informed Samsung that the device violated section 3.1 of the compatibility definition, in that it caused the GPS provider to “deviate from the documented behavior” by returning network location data as GPS data. To address the problem, the email requested, “you should separate out the Skyhook implementation in a separate location provider so as not to confuse 3rd party developers and users.” Google “cannot approve the current implementation as is,” but expressed willingness to assist Samsung in correcting the problem.
Samsung raised the issue with Skyhook. Skyhook’s response to Samsung was that Skyhook “has not received any formal notification from Google/Android or Motorola that Motorola has been blocked from shipping any devices” because of the compatibility issue, and that “Skyhook had passed both CTS and CDD certification.” Skyhook went on, “given that Sky-hook has successfully passed Android CTS at Samsung and Motorola, and Samsung has already begun shipping Google approved devices into the market, you should be sure to validate any statements made by Google and the basis for any determination they make,” because “[a] last minute-change or claim like this by Google should be considered by their motivation to retain ownership of the customer and location data that Samsung devices and Samsung customers generate.” Skyhook did not offer Samsung the revised version of XPS that Skyhook had delivered to Motorola on June 4, 2010, to address the compatibility issue.
Samsung devised its own modification to correct the problem, but not in time to meet its production schedule for some 25,700 units scheduled for shipment to Europe. By email dated June 18, 2010, Samsung requested that Google provide conditional approval for those devices, subject to a subsequent update. Google declined. An email from Google’s Andy Rubin, dated June 21, 2010, explained its decision as follows: “Unfortunately we cannot make an exception. This is a bad bug that breaks google’s internal systems and cannot be shipped until fixed.”
Meanwhile, Motorola pressed its position with Google. In an email dated June 17, 2010, Motorola inquired, “Can you tell us why the Samsung Galaxy S was approved to ship with the same Skyhook implementation with which we could not ship?” Google responded the same day: “I can’t comment on other partner devices, but I think you have some misinformation here. We’re working with all partners that have this issue, and we’re not granting waivers to some but not others. The initial build of the device in question did not ship with the issue, but the issue affects an update that has not yet shipped. All partners are fixing the issue (network-based location reported as GPS location).” Motorola responded later that morning, “An engineer purchased the device this morning in the UK and we are seeing the same code we could not use. So it has shipped. About what are we misinformed?” Minutes later, Google responded: “Interesting. Thanks for the heads up . . . Please send the build fingerprint if you don’t mind, and we’ll investigate. Obviously there was a breakdown in the process here. Either way, they are well aware of the issue and have a fix under review.” Motorola provided specifications of the Samsung device, and Google responded, “We’ll look into it.”
Meanwhile, Motorola responded to Skyhook, with an email dated June 18, 2010, in which it reported that “Google informed Motorola [of incompatibility] through normal channels and followed their normal process. Once the position was clarified regarding the non-compatibility of the current implementation, Motorola informed Skyhook in less than 24 hours.” The email went on to address the data collection issue, as follows:
In addition to Motorola’s obligation to distribute Android Compatible devices, Motorola has contractual obligations that require distribution of all GMS applications as they are provided by Google. As provided by Google, some of the GMS applications collect data elements similar to those in the Sky-hook “Reference Database.” While our Agreement with Skyhook provides that such data should not be provided to a third party, we also cannot ship devices without using the GMS applications as provided. Motorola’s desire is to ship with XPS, however, our current options are to either (a) ship devices with GMS applications without XPS, or (b) ship devices with GMS applications and an Android compatible implementation of XPS where it is acceptable to Skyhook to have GMS application return data results similar to the “Reference Database” to Google, as is occurring today in the Samsung Galaxy S. Please let us know how you would like to proceed by end of day Tues 22nd Jim.
While Motorola waited for Skyhook’s response, it had further communication with Google. In a series of emails on June 21, 2010, Motorola asked for an update regarding Samsung. Google responded: “I assure you that this issue is being resolved before any more devices ship.” Motorola responded that “As Samsung has shipped with the same build which we were not permitted to ship we find ourselves in an uncompetitive position in regards to Samsung. In addition this complicates our relationship with Sky-hook, as it now appears that the implementation they provided us is indeed shippable. Can we receive a waiver to use the current implementation, which would at least put us on an equal footing in regards to *424 both Samsung and Skyhook?” Google refused, explaining, “Unfortunately sometimes these issues are caught after ship, as was the case with Samsung, before we were aware of the general issue. I assure you that this has been escalated to the highest levels at Samsung, and they are resolving the issue immediately . . . Compatibility is a learning process and we hit new issues every day. The important thing is that we don’t repeat mistakes and that we take swift action to resolve those we find. This is an issue that affects many 3rd party developers, Google included, and we are taking a hard line on resolving it.”
Skyhook responded to Motorola’s email of June 18, 2010, with a formal “Notice of Dispute,” dated June 23, 2010, pursuant to dispute resolution procedures set forth in the contract between Skyhook and Motorola. The notice characterized Motorola’s June 18, 2010, communication regarding data collection as a notice of anticipatory breach. It went on to state that “Skyhook is willing to demonstrate to Motorola and to Google, how this background location data collection can be easily disabled or discontinued on Skyhook-enabled MAP devices without any impact on the performance of the applications or the devices so that Motorola can meet its obligations under our Agreement. Disabling this background data collection on GMS applications will help to resolve this issue rather quickly.”
Motorola responded by letter on July 2, 2010. Its position, in substance, was that its contracts with its carriers required it to include GMS, and that its contract with Google required that it “implement GMS applications fully and as they are provided to us by Google.” Those pre-existing contractual requirements, Motorola contended, excused it from any conflicting obligations in its contract with Skyhook. The letter went on to assert that Skyhook had breached the contract by issuing its press briefing on April 26,2010, without approval from Motorola. Despite that breach, the letter concluded, Motorola still wanted “to maintain a good relationship with Skyhook” and to “find[ ] an opportunity to work through this dispute.”
On the same date, July 2, 2010, Samsung informed Skyhook that it was no longer shipping Android devices pre-loaded with XPS. Samsung explained that decision in emails on July 9 and 10, 2010, as based on price and performance. Thereafter, Samsung did not install XPS on Android devices, although it did continue to install XPS on non-Android devices using Samsung’s own proprietary operating system, for which Google did not offer a location system.
Motorola, despite its increasingly adversarial communications with Skyhook, continued its efforts to reach a resolution with Google that would permit it to use XPS. In an email on July 13, 2010, Motorola informed Google that “Motorola and Skyhook have been working on making the changes that Google have requested in order to comply with the Android CDD. We think we can talk you through it in 15 minutes or so, would you have any time to do that today or tomorrow?" The same email raised a separate, technical issue regarding simultaneous use of XPS and NLP. Discussions of that issue over the next few weeks delayed further discussion of the revised version of Skyhook’s XPS. Meanwhile, Motorola proceeded to ship its MAP devices in mid-July without XPS.
As of mid-August, Motorola had not reached resolution with either Skyhook or Google, and made the decision to terminate its contract with Skyhook. Motorola did not communicate with Google about that decision. Motorola notified Skyhook of its decision by letter dated August 17, 2010, asserting that Skyhook had breached its obligations under the contract by “making inaccurate and unauthorized statements to the press, . . . failing to deliver a functioning product that can be loaded on Motorola Android-based products, and . . . [failing] to continue performance during the pendency of a dispute.” These breaches, the letter asserted, “are material and remain uncured,” despite notice more than thirty days earlier, as required by the contract. “Therefore,” the letter concluded, “Motorola views the Agreement as terminated as a result of Skyhook’s material breaches.” The letter went on, however, to express Motorola’s continued willingness “to work with Skyhook as appropriate” in the hope “that an amicable and productive resolution can be achieved through the mediation process.” Further efforts between Motorola and Skyhook continued until November 2010, but did not succeed.[20]
As to Samsung, on September 16, 2010, it executed an agreement with Google whereby NLP would be the default location service on Samsung’s Android devices. Google also selected Samsung as the lead partner for the 2010 version of Android.
Throughout this process, Google never held any meetings or discussions relating to Skyhook with either Motorola or Samsung in Massachusetts. Google did conduct such meetings and discussions with Motorola in California, and with Samsung in Korea. Skyhook had one meeting with Motorola in Massachusetts in July of 2010. The record discloses no meetings between Skyhook and Samsung in Massachusetts. Neither Motorola nor Samsung manufactures any devices in Massachusetts. The market for their devices is worldwide, including Massachusetts.
Skyhook brought this action against Google on September 15, 2010. Its complaint asserts three counts: intentional interference with the Motorola contract (count I); intentional interference with advantageous business relations with both Motorola and Samsung, and “potential business relationships with others” (count II)[21] and violation of G.L.c. 93A (count III). The gist of Skyhook’s position is that Google coerced Motorola to breach its contract with Skyhook, and coerced Samsung to decline to exercise the license it obtained under its agreement with Skyhook, by *425 asserting a pretextual and groundless compatibility objection, when its actual purpose was to harm Sky-hook and stifle competition. Google now moves for summary judgment on all counts.
DISCUSSION
This Court grants summary judgment where the record establishes that no genuine issues of material fact exist, and that the moving party is entitled to judgment as a matter of law. See Mass.R.Civ.P. 56(c); Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Community National Bank v. Dawes, 369 Mass. 550, 553 (1976). To show entitlement to summary judgment on a claim for which the opposing party has the burden of proof, it is sufficient for the moving party to establish that “the nonmoving party has no reasonable expectation of proving an essential element of its case.” Miller v. Mooney, 431 Mass. 57, 60 (2000); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991); see also Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). The opposing party must respond by identifying admissible evidence of specific facts sufficient to meet its burden; it may not rely on “conclusory allegations, improbable inferences, and unsupported speculation.” Brooks v. Peabody & Arnold, LLP, 71 Mass.App.Ct. 46, 56 (2008); see also Ng Bros. Constr., Inc. v. Cranney, 436 Mass. 638, 648 (2002).
I. Intentional Interference with Contractual and Advantageous Business Relations (Counts I and A).
To prevail on a claim of tortious interference with contractual or advantageous business relations, a. plaintiff must prove five elements: (1) that it had a contract or advantageous business relationship with a third party;[22] (2) that the defendant knew of the contract or relationship; (3) that the defendant interfered with the contract or relationship, inducing the third party to break the contract or terminate the relationship; (4) that the defendant did so by improper means or for an improper motive;[23] and (5) that the plaintiff suffered harm as a result.[24] Draghetti v. Chmielewski, 416 Mass. 808, 816 (1994); United Truck Leasing Corp. v. Geltman, 406 Mass. 811, 812 (1990).
Here, the parties do not dispute the first two elements, but do vigorously contest the other three. In the Court’s view, the evidentiary record, as summarized supra, is sufficient to permit a jury to find the element of interference, but not the element of improper motive or means. Accordingly, the Court will not reach the element of harm.
With respect to Motorola, the evidence is sufficient to establish that, as of May 28, 2010, Google had instructed Motorola not to ship its devices with XPS loaded in its original form. Motorola complied with that instruction, and removed XPS from the devices it was then preparing for shipment in July. As of that time, although Motorola had its own dissatisfactions with Skyhook, there is considerable evidence to indicate that it wanted to include XPS in its devices, and would have done so, pursuant to its contract with Skyhook, if not for Google’s instruction. That instruction, however proper or justified it might have been, could be found to have constituted interference with the contract between Skyhook and Motorola.
After June 4, 2010, when Skyhook provided its revised version, Google never again instructed Motorola not to ship devices with XPS. To the contrary, although it did not specifically either approve or reject the revised version, it made clear to Motorola that Motorola was free to include XPS, as long as XPS did not deviate from the CDD by returning non-satellite data through the GPS provider. If the revised version would have met that requirement, as Skyhook represented that it would, Motorola could have proceeded to include the new version of XPS, pursuant to its contract with Skyhook.
Why Motorola did not do so is a question to which the record would support conflicting answers. Motorola’s stated reasons, as set forth in its two termination letters, consisted of its various complaints about Skyhook’s conduct, including the April press release and performance deficiencies. .On the evidence offered, a factfinder could conclude that those reasons, although real, do not fully explain Motorola’s decision. At least as significant, a factfinder could conclude, was the conflict Motorola faced between its contractual obligation to Google that any Google applications included in its devices be fully operational, and its subsequent contractual undertaking to Sky-hook that no one other than Skyhook retrieve data. Google refused to waive its prior contract right, while Skyhook insisted on pressing its conflicting position, and refused to recognize the contractual exception for Motorola’s prior obligation. Faced with that conflict, Motorola chose Google. That choice is hardly surprising, in light of both the temporal priority of Google’s contract right, Motorola’s need for Google’s applications, and the market significance of its relationship with Google.
Google’s role in Motorola’s choice was only to refuse to waive its contract right. To call that refusal interference seems to distort the ordinary meaning of the word. The Court will nevertheless treat it as such, for present purposes, and move on to the element of improper motive or means. Courts evaluate the propriety of a defendant’s motive and means on a case by case basis. G.S. Enters., 410 Mass. at 273 (1991).
A showing of improper motive requires “proof of the defendant’s ‘actual malice,’ i.e., a ‘spiteful, malignant purpose, unrelated to the legitimate corporate interest.’ ” Brewster Wallcovering Co. v. Blue Mt. Wallcoverings, Inc., 68 Mass.App.Ct. 582, 608 (2007). “The motivation of personal gain, including financial gain... generally is not enough to satisfy the improper interference requirement.” King v. Driscoll, 418 Mass. 576, 587 (1995); United Truck, 406 Mass. at 817. Nor *426 is business competition an improper motive, although the use of improper means to prevail in business competition can give rise to liability. “If the actor succeeds in diverting business from his competitor by virtue of superiority in matters relating to their competition, he serves the purposes for which competition is encouraged.” Restatement (Second) of Torts, §768 cmt. e. “For competition and for the rough and tumble of the world of commerce, there is tolerance . . . even though the fallout of that rough and tumble is damage to one of the competitors.” Melo-Tone Vending, Inc. v. Sherry, Inc. 39 Mass.App.Ct. 315, 319 (1995); see also Berkshire Armored Car Services, Inc. v. Sovereign Bank of New England, 65 Mass.App.Ct. 96, 102-03 (2002) (conduct motivated by desire to advance a party’s business interest is not improper).
The record presented here identifies two closely related motives for Google’s conduct. First, Google sought to ensure that Motorola’s devices, marketed under the Android trademarks and with Google’s applications, would be compatible with what the parties have referred to as the Android “ecosystem” — that is, the broad universe of Android devices and applications developed, both by Google itself and by a multitude of independent developers, for use with the devices. Skyhook does not appear to contend that this purported motive was improper, but it does contend that it was a sham — that no genuine compatibility problem existed.
In the Court’s view, the evidence simply fails to support that contention. Motorola itself identified the compatibility problem months before Google did, based on the plain language of the compatibility definition, and Skyhook acknowledged the problem in its communications with Motorola. That Motorola set aside its concerns based on representations from Skyhook regarding other devices does not undermine the veracity of Google’s concern on the subject. Nor does Skyhook’s assertion that Google applied its compatibility requirements inconsistently; nothing in the record indicates that Google knowingly approved any device that, like XPS in its original version, would transmit location data in a manner that would misrepresent its source.
Google’s second objective, as reflected in the record, was to protect its own ability to collect data for inclusion in its database, along with the reliability of the data collected and incorporated. Data collection depended on full operation of its applications, while reliability depended on accurate identification of the source of the data received. The potential for inaccurate identification of the source of data arose from the same aspect of XPS that underlay the compatibility problem: the return of non-GPS data through the GPS provider. In this respect, the issues that Google referred to as incompatibility and data contamination were the same: by causing the GPS provider embedded in the device to operate in a manner other than as described in the definition documents, the original version of XPS would defeat the expectations of developers of applications for use on Android devices, including Google itself with respect to its own applications.
Skyhook asserts that Google’s motive to protect its data was improper. The Court perceives no legal or factual basis for that argument, particularly in light of Skyhook’s insistence on its own exclusive right to collect data under its contract with Motorola. Both Google and Skyhook considered data collection essential to the viability of their business, and to their ability to compete with each other and with others in the field. For Skyhook to suggest that Google’s motive to collect . accurate data was improper is to ignore its own corresponding conduct.
Skyhook’s theory on this point appears to be that Google hid its data collection motive behind its compatibility objection; that is, that the compatibility objection was a pretext for Google to accomplish an objective that its contract did not give it an explicit right to accomplish. This theory addresses not the motive, but the means; the contention is that the means was improper because it was dishonest, involving the use of a subterfuge. The problem with the theory is twofold: First, Google’s contract did give it the right to insist that its applications, if loaded at all, be fully operational, including data collection functions. Second, the record does not support the pretext theory. Rather, as discussed supra, what the record reveals is that what Google referred to as data contamination was a consequence of the same characteristic that constituted incompatibility. The evidence thus fails to support the element of improper motive.
As to means, the only conduct indicated in the evidence is Google’s instruction to Motorola not to ship devices that Google deemed incompatible, and its subsequent refusal to waive its contractual right to prevent installation of its applications in less than fully functional form. In both instances, Google exercised its contractual right. Again, the Court perceives no impropriety.[25] See Pembroke Country Club, Inc. v. Regency Sav. Bank, F.S.B., 62 Mass.App.Ct. 34, 38 (2004) (“The assertion by a party of its legal rights is not ‘improper means’ for purposes of a tortious interference claim”).
With respect to Samsung, Google’s conduct consisted of informing Samsung, on June 17, 2010, that it must not ship incompatible devices, and then, over the next few days, declining to grant Samsung’s request for a conditional waiver for devices scheduled for imminent shipment. As in the case of Motorola, although Samsung gave other reasons for its decision not to load XPS (price and performance), a factfinder could conclude from the evidence that Google’s directive at least played a role. On that basis, a factfinder could find the element of interference. But, for the same reasons already discussed, the evidence would not support a finding of impropriety; Google acted by *427 means of the exercise of contractual rights, for legitimate business purposes. The Court concludes, therefore, that Google is entitled to judgment as a matter of law with respect to counts I and II.
II. Violation of G.L.c. 93A, §11 (Count III).
Google argues that Skyhook’s claim of violation of G.L.c. 93A cannot stand because (1) the claim is entirely derivative of Skyhook’s tortious interference claims; and (2) the “actions and transactions constituting the alleged unfair method of competition or the unfair or deceptive act or practice” did not “occur! 1 primarily and substantially within the commonwealth,” as required by G.L.c. 93A, §11.[26] The Court agrees with the second point, and therefore will not address the first.
The statute, by its plain terms, places on the defendant the burden to prove that the conduct in issue did not occur primarily and substantially in Massachusetts: The test is “whether the center of gravity of the circumstances that give rise to the claim is primarily and substantially within the Commonwealth.” Kuwaiti Danish Computer Co. v. Digital Equip. Corp., 438 Mass. 459, 473 (2003). “On the one hand, a single instance of misconduct in one jurisdiction may have greater significance for a case as a whole than a multiplicity of instances of misconduct in another jurisdiction. On the other hand, the sheer number of instances of misconduct in one jurisdiction may produce the heft needed to resolve the question.” Id. Application of this test is often a question of fact for a jury. See G.S. Enters., 410 Mass at 277. But such factual questions can be, and often are, decided on summary judgment where the evidence is such that a reasonable fact-finder could reach only one conclusion. See, e.g., Brunner v. Stone & Webster Engineering Corp., 413 Mass. 698, 705 (1992).
Here, the evidence identifies no conduct of Google in Massachusetts. It conducted no meetings or discussions relating to Skyhook here with anyone, nor does the evidence indicate that it executed any documents here, or sent any mail, or even email, to anyone in Massachusetts in connection with the matters giving rise to the claim. Skyhook rests its position on its own loss of revenue, as well as on the loss of sales of devices that would have included its product in Massachusetts. The “situs of loss” is one factor a court can consider in determining whether the conduct complained of occurred primarily and substantially in Massachusetts. Kuwaiti Danish, 438 Mass. 472 n.13. But that factor alone does not suffice, in the absence of evidence of any conduct by the defendant in the Commonwealth. Compare Auto Shine Car Wash Sys., Inc. v. Nice ‘N Clean Car Wash, Inc., 58 Mass.App.Ct. 685, 6868-609 (2003) (where both the deception and the loss occurred in Massachusetts, the center of gravity of the 93A claim was primarily and substantially within the Commonwealth).
As to the loss of sales to consumers here, the undisputed facts establish that mobile devices are marketed worldwide. Thus, on Skyhook’s theory, the center of gravity of the transactions was everywhere in the world, and corresponding statutes of every jurisdiction would apply. Clearly, that is not the law. On the undisputed facts presented in this record, no reasonable jury could conclude that the “actions and transactions constituting the alleged unfair method of competition or the unfair or deceptive act or practice occurred primarily and substantially within the commonwealth.” Accordingly, Google is entitled to judgment as a matter of law on count III.
CONCLUSION AND ORDER
For the reasons stated, Defendant Google, Inc.’s Motion for Summary Judgment is ALLOWED.

 The Court appreciates that both sides appear to have made a genuine effort to comply with both the letter and the spirit of Rule 9A(b)(5). The statement of facts and references to it in the parties’ memoranda would have been easier to use if the plaintiff had numbered the paragraphs of its additional facts beginning with the next number after the defendants’ statement, rather than béginning with a second number 1 and proceeding from there with duplicate numbers. The Court also calls the attention of all counsel to Superior Court Rule 9A(a)(5), which requires that all motion papers be double-spaced. The parties’ memoranda submitted in connection with the present motion appear to be more than single-spaced, but less than double-spaced.

 Other GMS applications are Android Market, YouTube, Gmail, Google Search, Google Maps for Mobile, and Network Location Provider (NLP), which will be discussed further infra.

 Certain other applications, among them Google Maps, also retrieve data.

 The pertinent contract between Google and Motorola was in effect from May 1, 2009 through December 31, 2011. The pertinent contract between Google and Samsung was in effect from April 1, 2009, through December 31, 2011.

 The compatibility requirement appears in section 2.7 of each contract between Google and a manufacturer.

 An application programming interface (API) is a set of functions with defined inputs and expected outputs implemented by a software program that enables it to interact with other software in a software system. Both Google’s GPS provider and NLP are APIs.

 In contrast to the marketing disadvantage of denial of certification, a manufacturer who achieves certification and includes all Google applications has the opportunity to gain marketing advantage by being the first to introduce a new version of the Android operating system as Google’s designated “lead partner.”

 "Time-to-first-fix" refers to the time the system takes to report a location result. An internal Google document dated in March of 2009 reports that Google’s “latest competitive analysis,” in October 2008, had found that Skyhook’s system achieved better results than Google’s with respect to both speed and accuracy. The docum'ent refers to Google as “playing catchup” with Skyhook, and notes Google’s goal “to exceed Skyhook in both coverage and accuracy by the end of 2009.” Internal Google documents in 2010 reflect mixed views on whether Google had achieved that goal, or whether Skyhook’s XPS continued to surpass Google’s system on these measures.

 In an internal email dated February 19, 2010, a Skyhook engineer commented that “I do agree that reporting cell locations as GPS locations is just too confusing for an app.” Internal Motorola communications in February 2010 referred to the matter as “a bug that we shall fix," and “a serious problem [that] must be removed or we won’t be able to ship *428 in our lifetime.” On February 26, 2010, a Motorola employee commented in internal communication that “I just had sky-hook find a ‘GPS fix’ for me today that was about 5 miles off from where I really was AND it state it had a GPS fix accurate to 900m. What??? Their XPS —E stuffing GPS nonsense is absolutely a horrible user experience for location ... Its increasingly clear to me that we will be in violation of Android Compliance if we ship like this and may have stop ship issue on our hands.”

 Among these communications is the following: “in reading the docs i’m concerned as are many others that skyhook isn’t complying with all the Google apis so I’m worried that we will get close to trying to ship ruth [a name for one version of the device] and Google will say we can’t.” The same series of communications includes references to concerns about the performance of Skyhook’s product.

 Among those representations was a partial quotation from an email from Qualcom that a Skyhook employee passed on to Motorola in edited form, having deleted the phrase “Droid should not support this.”

 Google was not concerned with revenue directly from its applications: it does not charge for their use.

 Google defines “contamination” as “the intermingling of unreliable data with reliable data, including the reporting of data as of a type or from a source that it is not.” Skyhook has not proposed an alternative definition.

 The Court understands “apk’s” to refer to applications.

 Patrick Brady, Google’s group technology manager for Android, testified at his deposition that Google viewed Motorola’s inclusion of Google’s Network Location Provider in combination with Skyhook’s hybrid system as a “blocking issue,” because “we don’t want to ship our products on devices that will . . . degrade our products.” He went on to explain that, upon learning that the Motorola device would return hybrid data through the GPS provider, “our location team is complaining that this causes a problem, but it could cause a problem for anyone using this API. And so, that’s — at that point, you know, discussing with the compatibility team, we realized that this is actually a compatibility issue regardless of whether our teams can work out the contamination problem. The intent of the compatibility program is so that application developers don’t have to work around device-specific issues on every device ... I became aware . . . this is actually a compatibility problem regardless of whether we can . . . avoid contamination in our database.” Brady further explained that, in discussion with Google’s “location team,” he “set them straight on . . . what our rights and obligations were ... I understand their concerns, but we need to take a look at this from a compatibility perspective, and ... separate the issues of can they ship the device with a . . . competitive location provider, yes, and can they ship a device with an incompatibility implementation, no.”

 The Court understands “UX” to mean user experience.

 Samsung had informed Skyhook, earlier in June, that it would not include XPS in devices sold in the United States and Korea, citing cost.

 Motorola brought the same information to Google’s attention shortly thereafter.

 An internal email among Google personnel summarizing the meeting included the following points: Google “did not know about Skyhook until yesterday”: “Skyhook has implemented the solution in the same way as on the Motorola device,” using the GPS provider, so that “this phone could be contaminating our celllD/WiFi database with incorrect Lat/Long information for the GPS fix information”: that the writer had “made Samsung aware of the seriousness of this issue and have told them we would get back to them ASAP if we plan to block shipments”: that “]t]hey now understand the issue and realize that there should be no network information in the GPS provider,” and “have agreed to work with us to fix this . . . [t]heir next maintenance release is planned for September. It seems likely that we can get a fix into the production code before then through a special bug escalation path.”

 Motorola sent Skyhook a final notice of termination on November 18, 2010. Skyhook sued Motorola in Illinois in November of 2011, but moved for voluntarily dismissal of that action, without prejudice, on February 29, 2012. The Illinois court allowed that motion the next day.

 Skyhook does not now appear to press any theory related to manufacturers other than Motorola and Samsung.

 The phrase “contractual or advantageous relationship” comprehends an existing business relationship or contemplated contract of economic benefit. Powers v. Leno, 24 Mass.App.Ct. 381, 384 (1987); see also Blackstone v. Cashman, 448 Mass. 255, 259 (2007) (advantageous relationship is a present or prospective contract or employment relationship); Owen v. Williams, 322 Mass. 356, 361-62 (1948) (plaintiff needs to prove “an existing or even a probable future business relationship from which there is a reasonable expectancy of financial benefit . . .”). The distinction between intentional interference with advantageous relations and intentional interference with contractual relations rests on the existence of a contract. See Buster v. George W. Moore, Inc., 438 Mass. 635, 652 (2003) (intentional interference with advantageous relations requires defendant to induce third party into not continuing business relationship with plaintiff); compare G.S. Enters., Inc. v. Falmouth Marine, Inc., 410 Mass. 262, 272 (1991) (interference with contractual relations requires defendant to induce third parly into breaking contract). The substantive elements are substantially similar and Massachusetts courts have not consistently distinguished between the two. Shqfir v. Steele, 431 Mass. 365, 370 n.10 (2000); Cavicchi v. Koski, 67 Mass.App.Ct. 654, 657 (2006).

 “[I]mproper conduct, beyond the interference itself, is ‘an element both in the proof of intentional interference with performance of a contract. . . and in the proof of intentional interference with a prospective contractual relationship.’ ” Hunneman Real Estate Corp. v. Norwood Realty, Inc., 54 Mass.App.Ct. 416, 427 (2002).

 Harm is a loss of advantage or damage to an economic relationship that resulted directly from the defendant’s conduct. Kurker v. Hill, 44 Mass.App.Ct. 184, 191 (1998); Ratner v. Noble, 35 Mass.App.Ct. 137, 138 (1993). If the plaintiff does not suffer any pecuniary loss as a result of the defendant’s actions, there can be no recovery. Birbiglia v. Saint Vincent’s Hosp., Inc., 427 Mass. 80, 83 (1998); Ratner, 35 Mass.App.Ct. at 138 (essence of tort is damage to business relationship).

 As Skyhook points out, the use of threats can constitute improper means. United Truck Leasing, 406 Mass. at 816. See Cavicchi v. Koski, 67 Mass.App.Ct. 654, 658 (2006); TalentBurst, Inc. v. Collabera, Inc., 567 F.Sup.2d 261, 269 (D.Mass. 2008) (applying Massachusetts law); see also Restatement (Second) of Torts, §766(k) (improper means may be “a threat ... of economic harm . . .”). The evidence does not indicate that Google made any threat to Motorola. Rather, it expressly directed Motorola not to ship an incompatible product. As discussed supra, Google had the right under its contract to give that direction.

 General Laws c. 93A, §11, states: “No action shall be brought or maintained under this section unless the actions and transactions constituting the alleged unfair method of competition or the unfair or deceptive act or practice occurred primarily and substantially within the commonwealth. For the purposes of this paragraph, the burden of proof shall be upon the person claiming that such transactions and actions did not occur primarily and substantially within the commonwealth.”