96                      65 Mass. App. Ct. 96 (2005)

Berkshire Armored Car Services, Inc. *v.* Sovereign Bank of New England.

BERKSHIRE ARMORED CAR SERVICES, INC. *VS.* SOVEREIGN
BANK OF NEW ENGLAND.

No. 04-P-832.

Berkshire. April 13, 2005. - November 10, 2005.

Present: GREENBERG, SMITH, & KATZMANN, JJ.

*Practice, Civil,* Directed verdict, Judgment notwithstanding verdict. *Contract,* Interference with contractual relations. *Consumer Protection Act,* Bank, Businessman's claim.

In a civil action alleging that the defendant had intentionally interfered with the plaintiff's contract with a third party, the trial judge erred in denying the defendant's motions for a directed verdict and for judgment notwithstanding the verdict, where the plaintiff failed to establish that the defendant knew of the plaintiff's contract or that the defendant had an improper motive intentionally to interfere with that contract. [101-103]

A trial court judge's findings in favor of the defendant in a claim under G. L. c. 93A were not clearly erroneous. [103]

CIVIL ACTION commenced in the Superior Court Department on August 18, 2000.

The case was tried before *Daniel A. Ford, J.*

*Kathleen C. Stone* for the defendant.

*Robert C. Sacco* for the plaintiff.

*Ben Robbins & Andrew Grainger,* for New England Legal Foundation & others, amici curiae, submitted a brief.

SMITH, J. On August 18, 2000, Berkshire Armored Car Services, Inc. (Berkshire), filed a complaint in Superior Court against Sovereign Bank of New England (Sovereign). The complaint alleged two counts: count I for intentional interference with contractual relations, and count II for violation of G. L. c. 93A.

Prior to discovery, Sovereign filed a motion to dismiss the complaint for failure to state a claim pursuant to Mass.R.Civ.P. 12(b)(6), 365 Mass. 755 (1974), or in the alternative, for sum-

mary judgment under Mass.R.Civ.P. 56(b), 365 Mass. 824 (1974). The motion was denied. Following discovery, Sovereign moved for summary judgment which was denied.

Prior to trial, the judge advised the parties that he would submit count II (the c. 93A count) to the jury for a nonbinding advisory verdict. At the close of Berkshire's evidence, and again at the close of all evidence, Sovereign moved for a directed verdict. Both motions were denied by the judge. The jury returned a special jury verdict in favor of Berkshire on count I and awarded damages in the amount of $52,000. The jury also returned an advisory verdict in favor of Berkshire on the c. 93A claim. Berkshire filed a motion on that count for an award of attorney's fees and treble damages. The judge entered judgment in favor of Berkshire on count I and Sovereign moved for judgment notwithstanding the verdict or in the alternative for a new trial. The judge denied Sovereign's motion. The judge then filed a memorandum of decision, ruling that Berkshire had not proved a G. L. c. 93A violation. Final judgment entered on February 28, 2003, in favor of Berkshire on count I, and for Sovereign on count II. Sovereign filed a timely notice of appeal as to count I, and Berkshire filed a notice of cross appeal as to both counts, seeking to reverse the judgment on the c. 93A claim and seeking remand for additional damages on the interference claim.[1]

*Denial of Sovereign's motions for a directed verdict and judgment notwithstanding the verdict.* Sovereign claims that it was error for the trial judge to deny its motions for a directed verdict and for judgment notwithstanding the verdict. In reviewing the denial of a directed verdict or a judgment notwithstanding the verdict, the question before us is the same: that is, "whether 'anywhere in the evidence, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be drawn in favor of the plaintiff.' " *Raunela* v. *Hertz Corp.*, 361 Mass. 341, 343 (1972), quoting from *Kelly* v. *Railway Exp. Agency, Inc.*, 315 Mass. 301, 302 (1943). "We do not weigh the evidence or consider

---

[1]We acknowledge the amicus brief filed by the New England Legal Foundation, the Massachusetts Bankers Association, and the Associated Industries of Massachusetts.

the credibility of witnesses." *Conway* v. *Smerling*, 37 Mass. App. Ct. 1, 3 (1994), citing *Rubel* v. *Hayden, Harding & Buchanan, Inc.*, 15 Mass. App. Ct. 252, 254 (1983). "Evidence that contradicts the testimony of the nonmoving party is to be ignored." *Conway* v. *Smerling*, 37 Mass. App. Ct. at 3, citing *Bennett* v. *Winthrop Community Hosp.*, 21 Mass. App. Ct. 979, 982 (1986).

Taking the evidence and all reasonable inferences in favor of Berkshire, the jury could have found the following facts. Berkshire is an armored car company which provides various services for businesses and banks. For businesses, Berkshire on some occasions will transport cash receipts to a designated location, either a bank or Berkshire's own terminals. For banks, Berkshire, among other things, maintains at certain of its terminals "money rooms" where it performs cash processing services on behalf of the bank.[2] Since 1991, Fleet Bank (Fleet) by contract used Berkshire to verify the amounts of certain Fleet customers' deposits at money rooms maintained by Berkshire in Massachusetts and in Burlington, Vermont. The contract was on a month-to-month basis.

On May 1, 1998, Berkshire entered into a contract with Victory Dist. Inc., doing business as Victory Supermarkets (Victory), a supermarket chain with twenty stores in Massachusetts and southern New Hampshire. The contract was renewable on a one-year basis subject to a thirty-day notice of termination. The contract called for Berkshire to pick up cash and checks at various Victory supermarkets daily and transport them to a Berk-

---

[2]The evidence is undisputed as to the functions performed at money rooms. Instead of having a business's cash receipts delivered directly to the bank to be counted by bank tellers, a bank may enter into a contract with an armored car company wherein the bank establishes a branch known in the industry as a money room or money center or remote vault. In the money room, the armored car company maintains a remote vault, and its personnel count the customer's cash receipts, verify the total, and report the amount collected to the bank in order for the customer's account to be credited. Thus, the armored car company performs the role of a bank teller, acting as the agent of the bank, which relies on it to report correct totals.

The relationship between a bank and the armored car company in establishing a money room for cash processing purposes is entirely independent from any relationship that may exist between an armored car company and the business customer whose money it transports.

shire terminal. The contract further called for Berkshire to process the cash at its money room.[3]

Berkshire's contract with Victory was separate from its cash processing contract with Fleet, although at the time of Berkshire's contract with Victory, the supermarket chain was a customer of Fleet. At one of the money rooms Fleet had established with Berkshire, Victory's cash receipts were counted by Berkshire's personnel, the totals were verified, and Victory's account at Fleet was credited. Victory required same-day credit from the bank; therefore, Berkshire had to deliver and count the cash receipts before Fleet's deadline for passing credit to Victory's account. Under the contract with Victory, Berkshire would send invoices to Fleet for the cash processing services. Fleet would pay Berkshire, and Victory then reimbursed Fleet for the processing costs.

In 1999, Fleet merged with Bank Boston, and as a result of the merger, Fleet was required to divest itself of certain branches and accounts, which were transferred to other banks. Sovereign took over 287 branches from Fleet and Bank Boston, and received approximately one hundred commercial accounts, including Victory's.

Sovereign did not take over Fleet's contract with Berkshire but decided to use its own personnel to process cash receipts, rather than rely on armored car companies. It planned to establish its own money room at a bank facility in Dorchester for that purpose. However, because that facility was not ready, Sovereign decided to use armored car companies for cash-processing purposes in the interim.

The Sovereign employees in charge of soliciting bids from armored car companies for cash processing were Kathy Oliver and Richard Bausemer, former employees of Bank Boston who had moved to Sovereign after the merger. While at Bank Boston, Oliver was aware of hostility at that bank toward Berkshire.[4]

Oliver knew that six armored car carriers, including Berk-

---

[3]The cash processing aspect of the contract Berkshire entered into with Victory will be discussed later in this opinion. See note 6, *infra*.

[4]The bad feelings at Bank Boston resulted from a judgment Berkshire had obtained in April of 1999 against Bay Bank Systems, Inc. (Baybank). The amount of the award was approximately $480,000 at the time of the final

shire, serviced all or part of New England. She asked four of the six carriers for bids. Berkshire and one other carrier (that carrier only operated in southern Connecticut) were not asked to bid on the contract because, according to Oliver, they had limited geographic reach. Bausemer, however, was familiar with Berkshire's territory and knew that Berkshire had terminal locations throughout Massachusetts, Southern New Hampshire, Rhode Island and Vermont, the geographical area of the Victory stores. Oliver and Bausemer conferred in making the decision not to solicit a bid from Berkshire.[5]

By March 6, 2000, Oliver had received bids from four armored car companies to handle Sovereign's interim cash processing needs. Oliver recommended that Sovereign use two armored car carriers, AMSA and Brinks, to handle the bank's cash processing needs during the period before the bank's Dorchester facility would be available. Her recommendations were accepted. The bank established a money room at an AMSA terminal.

At the time of the award of contracts to AMSA and Brinks, Sovereign was unaware of Berkshire's contract with Victory to process Victory's cash receipts. Oliver did not become aware that Victory's account would be transferred to Sovereign until June of 2000. AMSA was assigned to the Victory account.

By June 27, 2000, Bausemer knew that Berkshire was picking up Victory's cash receipts on a daily basis and also performing cash processing services at its money room for Victory. On July 18, 2000, Sovereign representatives, including Oliver, met with Victory representatives. Sovereign told Victory that it could continue to use Berkshire as a transportation carrier but

judgment. By that time, Baybank had merged with Bank of Boston to form Bank Boston. Bank Boston assumed responsibility for payment of the judgment. A meeting was held between Berkshire representatives and Bank Boston representatives in regard to the payment of the judgment. Berkshire refused to compromise on the judgment and the Bank Boston representatives became angry and by their choice of words implied that they intended to put Berkshire out of business.

Following Berkshire's insistence that it be paid, it lost all of its business with Bank Boston and with Fleet after Fleet's merger with Bank Boston.

[5]Berkshire's evidence that it was not asked by Sovereign to bid on the contract was offered for the sole purpose of showing that Sovereign was hostile to it obtaining any business from the bank.

could not use Berkshire to count Victory's cash receipts because the bank was not going to use Berkshire's money room. Instead, Berkshire would have to transport Victory's cash receipts to AMSA's money room for counting purposes. Sovereign refused to designate Berkshire's terminal as a money room after it learned of Victory's contract with Berkshire, even though the only requirements for a bank to designate a money room to accept its deposits were evidence of insurance and occasional inspections by a bank representative to check on security. Berkshire's money room met those requirements.

Although Victory had a good relationship with Berkshire and wanted it to continue to handle Victory's cash processing, after listening to Sovereign it believed that it had no choice but to substitute AMSA for Berkshire for cash processing. As a result, on July 21, 2000, Berkshire was forced to stop processing Victory's cash receipts.

Because it no longer did cash processing for Victory, Berkshire was forced to increase the amount it charged Victory for transportation. By letter dated March 26, 2001, Victory terminated its transportation contract with Berkshire, effective May 1, 2001, because of the price increases.

Berkshire claims that Sovereign intentionally interfered with its transportation contract with Victory by refusing to use Berkshire for the bank's cash processing.

In order to prevail, Berkshire was required to prove that (1) it had a contract with Victory; (2) Sovereign knew of the contract; (3) Sovereign's interference with the contract, in addition to being intentional, was improper in motive or means, and (4) Berkshire suffered harm as a result of Sovereign's interference. See *Shea* v. *Emmanuel College*, 425 Mass. 761, 764 (1997); *Pembroke Country Club, Inc.* v. *Regency Sav. Bank, F.S.B.*, 62 Mass. App. Ct. 34, 38 (2004).

It is undisputed that Berkshire had a contract with Victory for transportation and cash processing.[6] However, there is no evidence that Sovereign knew of Berkshire's contract with Vic-

---

[6]The evidence as to Berkshire's duties in regard to the cash-processing aspect of the contract with Victory, in contrast to its cash-processing duties under the Fleet contract, was thin.

tory in March of 2000 when it selected the two armored car companies for cash processing services in the period before its own money room was ready. In view of Sovereign's lack of knowledge of Berkshire's contract with Victory, Berkshire did not show that Sovereign's choice was anything other than a legitimate business decision. That decision, however, did have an impact on Berkshire's contract with Victory — a Sovereign customer — because Sovereign selected armored car companies other than Berkshire to establish money rooms and perform cash processing on the bank's behalf.

On this record, Sovereign was not required — once it learned of Berkshire's contract with Victory, which included cash processing — to use Berkshire's money room. A bank has the right to determine the method by which money deposited with the bank is counted. Here, Sovereign had already made that decision some time before it learned of Berkshire's contract with Victory.

There was plenty of evidence of Sovereign's hostility toward Berkshire. Berkshire was required, however, to link that hostility with Sovereign's refusal to allow Victory to use Berkshire's money room for counting Victory's cash deposits with Sovereign. See *Sklar* v. *Beth Israel Deaconess Med. Center*, 59 Mass. App. Ct. 550, 555 (2003). In view of Sovereign's legitimate decision made in March of 2000, before it knew of Berkshire's contract with Victory, and the concept and function of money rooms, as shown on this record (see note 2, *supra*), Berkshire failed to establish that Sovereign had an improper

---

In regard to cash processing, Berkshire's contract with Victory states only, "Orders/deposits to be processed at Berkshire's . . . money centers with Bank Boston or Fleet Bank." In the contract sections labeled "Scope of Operation" and Responsibility of the Carrier," there is no reference to cash processing at all. Further, there is no schedule of fees in the contract for the cash processing services.

A Victory employee was asked what the contract required Berkshire to do for Victory. His reply was: "Pick up the money at the stores, count it and bring it to the bank."

Berkshire's contract with Fleet also required it to count money. There was no direct evidence distinguishing the counting of money under both contracts, beyond testimony that Berkshire billed Victory for transporting and Fleet for processing the cash.

motive intentionally to interfere with Berkshire's contract with Victory.

Therefore, Sovereign's motion for a directed verdict, and alternatively, its motion for judgment notwithstanding the verdict, should have been allowed.

*Denial of Berkshire's c. 93A claim.* Berkshire argues that the judge committed error in ruling in favor of Sovereign on its G. L. c. 93A claim.

The judge did not accept Berkshire's argument that Sovereign's employees intentionally interfered with Berkshire's contract with Victory. The judge found that, even if Sovereign's employees had displayed hostility toward Berkshire, Sovereign's decision was motivated primarily by a desire to advance the bank's business interests and therefore its action was not improper.

The judge sat as a fact finder on this claim. We give deference to decisions of a trier of fact who is usually in a superior position to appraise and weigh the evidence. *Buster* v. *George W. Moore, Inc.,* 438 Mass. 635, 642 (2003). We cannot say that the judge's findings were clearly erroneous.

We reverse the judgment on count I and order a new judgment to issue in favor of Sovereign. We affirm the judgment entered on count II.

*So ordered.*