Kaplan, Mitchell H., J.
This dispute has its genesis in plaintiff Russell Dow’s claims against defendants Gregoiy Casale (Casale), James Strahle (Strahle), and Lawrence Baker (Baker) for violation of the Massachusetts Wage Act, G.L.c. 149, §§148 and 150 (the underlying action). Judgment has previously entered holding Casale and Strahle liable for Starbak, Inc.’s failure to pay Dow salary and other benefits that he was owed.[1] See Memorandum and Order on Plaintiffs Motion for Summaiy Judgment, Defendant Gregoiy Casale’s Cross Motion for Summaiy Judgment, James Strahle’s Motion for Summaiy Judgment, and Defendant Lawrence Baker’s Motion for Summaiy Judgment (July 14, 2011) (Lauriat, J.) [29 Mass. L. Rptr. 132). After Dow filed his complaint, Casale filed cross claims against Strahle and Baker, and a third-party complaint against Kaufman and Ballantine, seeking to recover all or part of any liability that Casale had to Dow. Casale’s cross claims and third-party claims pled counts for breach of fiduciary duty (Count I); intentional interference with advantageous business relations (Count II); and contribution (Count III), against each of Strahle, Baker, Kaufman, and Ballantine. The case is now before the court on Baker’s, Kaufman’s, and Ballantine’s motions for summaiy judgment dismissing all claims asserted against them by Casale, which are the only unresolved claims still pending.[2] For the following reasons, the motions will be allowed.
BACKGROUND
Starbak, Inc.[3] is a corporation organized under Delaware law, with its principal place of business in Massachusetts. Casale was Chief Executive Officer of Starbak from March 15, 2007 until February 2010; beginning in April 2009, he also held the titles of President and Treasurer. From March 15, 2007, until he was removed from all his offices on March 27, 2009, Baker was President, Chairman, Secretary and Treasurer of Starbak. Strahle was the Chief Operating Officer from early 2008 until January 29, 2010. From March 15, 2007 until February 5, 2010, Dow was Director of Sales.
At the time relevant to this action, Starbak had two classes of stock outstanding: common stock (2,055,000 aggregate shares and options), and Series A preferred stock (796,906 aggregate shares and options). During the relevant period, Casale held 271,000 shares of common stock and 110,000 options/warrants (presumably to acquire common stock) or 13.4% of aggregate shares, options and warrants. Strahle owned 271,000 of common stock and 77,880 options/warrants, or 12.2%. Baker, Kaufman and Ballantine each owned 271,000 shares of stock and no options/warrants, or 9.5%. Charles Callahan, who is not a party to this action, owned 75,000 of Series A preferred stock and 60,000 options/warrants, and, during the relevant time, was a member of the Starbak Board of Directors (the board) together with Casale and Strahle.
On January 29, 2010, an involuntary Chapter 11 bankruptcy petition was filed against Starbak in the United States Bankruptcy Court for the District of Massachusetts.[4] On February 5, 2010, Starbak ceased doing business and terminated its employees. Starbak then owed Dow $138,957.19 in commissions, expenses and accrued vacation. Dow filed this action on April 1, 2010, claiming a violation of the Wage Act, and seeking treble damages and attorneys fees and costs.[5] Thereafter, Casale filed the cross claims and third-party claims which are the subject of this motion.
*93 On November 8, 2011, the Court (Lauriat, J.) ordered judgment to entér for Dow on his Wage Act claim against Casale and Strahle, jointly and severally, in the amount of $337,168.23 in damages with interest as allowed by law, and $25,000 in attorneys fees and costs; final judgment on Dow’s claims entered on November 15, 2011.[6]
The events giving rise to the cross claims and third-party complaint now before the Court took place principally during 2009 and January 2010. Starbak was then operating at a loss and being pressed by its principal creditor, Silicon Valley Bank. In an effort to attract new capital, Casale and Callahan entered into discussions with Daniel H. Bathon, Jr. (Bathon), President of Windspeed Ventures, a venture capital firm. Callahan was obviously interested in protecting the interests of the Series A Bondholders. While Casale owned only common stock, he had another reason to be invested in a successful financing transaction—the resolution of Dow’s claims for wages and commissions. Windspeed proposed to raise approximately $2,000,000 through an offering of Series B preferred stock. In connection with its due diligence, Windspeed had reviewed Starbak’s debts and was aware of the sums due Dow. Bathon was able to negotiate an arrangement with Dow in which, as part of the financing, Dow would accept an equity position in Starbak in lieu of some of the cash due him. Exh. F, Bathon depo. at28-29. Windspeed presented at least two term sheets to Starbak in early fall, 2009.[7]
On December 24, 2009, the board rejected Windspeed’s then pending term sheet. Email suggests that the rejection was based on demands made by the Series A Preferred shareholders for deal changes that favored them. Bathon notified Starbak’s lenders, including Silicon Valley Bank, that Windspeed was not going to proceed with the financing. During the first few days of January 2010, Callahan and Casale resurrected negotiations in, and the Starbak board accepted, Windspeed’s proposal set out in a “final term sheet” on January 5, 2010. The term sheet reflected an agreement in principal between Starbak and Windspeed Ventures III, L.P. Bathon anticipated that a closing would take place by early February 2010.
The final term sheet addressed Dow’s claims. It also called for a substantial dilution of the ownership interests that the common shareholders and the Series A preferred shareholders held in Starbak, but the two groups of equity holders were treated differently. The defendants’ aggregate percentage ownership of Starbak equity was to be reduced from 40.74% to 4.14%, approximately a 90% reduction. The interest of the Series A shareholders, on the other hand, was to be reduced from 27.94% to 16.99%, a 39.2% reduction.
Additionally, as a condition to the financing, Windspeed demanded that each of the defendants execute a general release pursuant to which each defendant would waive any right to sue Windspeed and agree to jointly and severally indemnify Windspeed for all costs and expenses (including attorneys fees and related expenses) suffered directly or indirectly if the transaction failed to close and the failure was due to any of the defendants voting against the transaction in a stockholder or director capacity. It is undisputed that no one signed the releases.[8]
Not surprisingly, the defendants were displeased with the terms of the proposed financing. Since at least November 2009, Kaufman, Baker and Ballantine expressed their displeasure that the proposals called for the common shareholders and Series A Preferred shareholders to be treated so differently. On November 24, 2009, Kaufman, Ballantine and Baker met with one of the Series A shareholders, PaulWessling, to express their dissatisfaction with the manner in which the common shareholders were being treated. Kaufman said that he would “go nuclear” if the common shareholders’ position was not improved. Wessling expressed his view that the arrangement was fair, given the investments made by the Series A Preferred group. At some point, Ballantine prepared a term sheet that had the common shareholders and Series A Preferred treated equally. The record is unclear as to whether it varied any other terms, but the proposal never went anywhere.
Shortly after the final term sheet was signed, Strahle successfully solicited proxies from two Starbak employees, Lance Camlet and Matt Schmitt. Schmitt’s understanding was that Strahle was going to use the proxies to reject Windspeed’s offer in order to pursue more favorable terms, which Schmitt thought would result in a “better deal” for himself. Exh. G, Schmitt depo. 9. On January 13, 2010, Kaufman and Ballantine told Casale that, with the additional proxy votes, they had a 52% majority interest in Starbak, and they had voted their shares to elect Kaufman and Ballantine to an expanded board. A Written Consent of Stockholders in Lieu of a Special Meeting was delivered to Casale and Callahan, reflecting the increase in the board from three to five members; Strahle, Kaufman, and Ballantine appointed Kaufman CEO. Kaufman emailed the board that a special meeting was to be held the next day, January 14, 2010, “to deal with business matters currently before the Company,” but the meeting never took place, and there was no subsequent board vote with respect to the Windspeed deal.
At or about this time, Casale, Kaufman, and Ballantine participated in a conference call with representatives from Silicon Valley Bank and another secured lender Gold Hill Capital. During the call Kaufman and Ballantine stated that they wanted to renegotiate the terms of Starbak’s notes with the creditors and the terms of the Windspeed financing. Apparently, both Silicon Valley Bank and Gold Hill insisted that the deal go forward as proposed by Windspeed.
Bathon testified that, after discovering the proxy solicitation and the expansion of the board, and concerned that the defendants controlled the company, he decided that Windspeed was no longer interested in the financing transaction. During a meeting that included Kaufman, *94 Ballantine, and another Windspeed representative, Bathon stated that Windspeed had made the best offer it could for Starbak. He also made clear that Kaufman and Ballantine would have to resign from the board and that all the defendants would have to sign the releases for Windspeed to continue. He set a deadline of January 20, 2010. Kaufman and Ballantine resigned from the board on January 15, 2010. It is undisputed that the board took no corporate action and passed no resolutions while Kaufman and Ballantine were members.
By email dated January 20,2010, Bathon informed Casale that the time for acceptance had passed and Windspeed was formally withdrawing its offer to invest in Starbak. Bathon listed two reasons for the decision: (1) failure to obtain “all requisite consents to the transaction,” including executed releases from Baker, Strahle, Kaufman, and Ballantine; and (2) inability to secure a satisfactory CEO candidate.[9] Strahle, Baker, and Brian Gagne, all creditors of Starbak, filed the involuntary petition for bankruptcy and, on February 5, 2010, Starbak closed its doors.
Casale claims that each of the defendants breached their fiduciary duly to him and interfered with Starbak’s advantageous relations with Windspeed when they failed to sign the documents necessary to consummate the deal with Windspeed and Starbak was forced into bankruptcy. Casale confirmed during oral argument on these motions that the damages that he seeks against Kaufman, Ballantine and Baker are indemnification of or contribution toward his liability to Dow. The defendants respond that, under Delaware law, minority shareholders in a closely held corporation do not owe a fiduciary duty to other shareholders unless they have control over the business decisions of the company. As to Casale’s claim of intentional interference, the defendants argue that any interference was not improper in either means or method and, in any event, Casale has no standing to assert a claim alleging a wrong to the corporation.
DISCUSSION
This Court grants summary judgment where, viewing the evidence in the light most favorable to the non-moving party, all material facts have been established and the moving party is entitled to judgment as a matter of law. Cabot Corp. v. AVX Corp., 448 Mass. 629, 636-37 (2007); Mass.R.Civ.P. 56(c). ‘The moving party must establish that there are no genuine issues of material fact, and that the nonmoving party has no reasonable expectation of proving an essential element of its case.” Miller v. Mooney, 431 Mass. 57, 60 (2000). See also Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). When the moving party does not bear the burden of proof at trial, as is the case here, it is entitled to summary judgment either by submitting affirmative evidence that negates an essential element of the opposing party’s case, or by demonstrating that the opposing party has no reasonable expectation of proving an essential element of its case at trial. KourouvaciUs v. General Motors Corp., 410 Mass. 706, 716 (1991).
1. Breach of Fiduciary Duty (Count I)
Starbak was a Delaware corporation and, therefore, Delaware law governs Casale’s breach of fiduciary duty claims. See, e.g., Harrison v. Netcentric Corp., 433 Mass. 465,471 (2001) (state of incorporation dictates choice of law regarding internal affairs of corporation). Under Delaware law, a shareholder owes a fiduciary duly only if it owns a majority interest in or exercises control over the business affairs of the corporation. Ivanhoe Partners v. NewmontMin. Corp., 535A.2d 1334, 1344 (Del. 1987). See also Kaplan v. Centex Corp., 284 A.2d 119, 122-23 (Del.Ch. 1971) (to successfully allege domination in the absence of controlling stock ownership, plaintiff must allege literal control of corporate conduct); Kahn v. Lynch Communication Sys., Inc., 638 A.2d 1110, 1113-14 (Del. 1994).
Casale argues that the defendants effectively controlled Starbak, because Kaufman and Ballantine told Casale that, after the proxy solicitation and expansion of the board, they controlled the company. He first argues that the defendants’ 52% ownership interest makes them majority shareholders with a concomitant fiduciary duty to Casale. As evidence of actual control of Starbak, Casale points to Kaufman and Ballantine’s instruction to Casale that he set up a meeting with the secured lenders, and the meeting Kaufman and Ballantine set up with Windspeed. The fact that Casale set up the meeting does not establish control. It establishes only that Casale was trying to save the Windspeed deal. Their individual meeting with Windspeed (the board did not meet) proves nothing.
Absent some express agreement “or a modicum of cosanguinity” between the defendants, “shareholders are presumed to be several and may not be compounded.” Amadeus Global Travel Distribution, S.A. v. Orbitz, LLC, 302 F.Sup.2d 329, 337 (D.Del. 2004). Nothing in the record demonstrates that the defendants had such an agreement. While there is evidence that, at least during the relevant time period, they had parallel interests, i.e., they did not want to participate in a deal in which their ownership interests in Starbak were diluted to such a greater extent than the preferred shareholder, “if having parallel interests is enough to make investors a control group . .. judicial interference in the affairs of corporations would be enormously magnified.” Id., quoting Kennedy v. Venrock Associates, 348 F.3d 584, 591 (7th Cir. 2003) (internal quotations omitted). Here, the defendants all voted to elect Kaufman and Ballantine to the board, with the intention, the Court can infer, to. renegotiate the Windspeed deal at the next board meeting. While the defendants had a common interest in shifting the balance on the board, appointing Kaufman as CEO, and changing the terms of the transaction, that is not a reason to consider their stock ownership collectively. Simply put, they all voted the same way because they thought it was in their economic interests to do so.
*95 Furthermore, there is no evidence that, as minority shareholders, the defendants demonstrated an actual exercise of direction “over corporate conduct in such a way as to comport with the wishes or interests of the corporation (or persons) doing the controlling.” Kaplan, 284 A.2d at 123. That Kaufman and Ballantine considered themselves in control for two days, instructed Casale to call the secured lenders, and met with representatives of Windspeed hardly rises to the level of actual control over Starbak’s conduct in any meaningful way.[10] Kaufman and Ballantine resigned from the Board and Kaufman as CEO two days after they were appointed and the board did not cause the corporation to take any action and passed no resolutions during the two days that they were members.' Under Delaware law, control cannot be merely hypothetical. Amadeus Global, 302 F.Sup.2d at 335. Without more, Casale’s assertion that the defendants were in control of the company is thus unavailing. See Polaroid Corp. v. Rollins Envtl. Sews., Inc., 416 Mass. 684, 696 (1993) (“[B]are assertions and conclusions . . . are not enough to withstand a well-pleaded motion for summary judgment”). See also Mod-son v. Erwin 395 Mass. 715, 721 (1985) (unsupported assertions and conclusoiy statements are unacceptable to defeat summary judgment). Where the defendants are minority shareholders who did not exercise actual control over Starbak, they have no fiduciary duty to Casale in his capacity as a shareholder under Delaware law.
There are, however, more fundamental reasons why no viable claims for breach of fiduciary duty lie against Kaufman, Ballantine or Baker. First, the Windspeed deal required that Kaufman, Ballantine, Baker, and Strahle individually vote their shares in favor of the Windspeed proposal and then individually sign the general releases. This was not collective action, it required an individual decision by each of them. Also, the deal did not fail because of some collective action. Even after Strahle obtained the proxies and Kaufman and Ballantine purportedly joined him on the board, and after Kaufman and Ballantine resigned from the board, Windspeed was prepared to go forward with the financing, subject to all of the other conditions in the final term sheet, but only if each of the defendants individually voted in favor of the transaction and signed the releases by January 20, 2010. As individuals with minority interests in Starbak, they had no obligation to take those individual actions. Indeed, even under the expanded fiduciary obligations that minority shareholders owe one another in closely held corporation under Massachusetts law, common shareholders would not be required to sacrifice their equity interest in a corporation for the benefit of preferred shareholders who insist on preferred treatment in a down round of financing, at least when the common shareholders are not contractually obligated to accept a cram down.[11]
Moreover, Casale is not seeking to recover his ownership value in Starbak, which would have been de minimus after the dilution demanded of common shareholders in the final term sheet, but rather insurance against his liability to Dow because of his violation of the Wage Act. The fact that Windspeed would not invest without resolving Starbak’s liability to Dow (if Starbak continued as a going concern) was an individual benefit to Casale, but not one that any of Kaufman, Ballantine, and Baker, who had no obligations to Dow, had a duty to protect.
2. Interference with Advantageous Business Relations
The tort of intentional interference with advantageous relations “protects a plaintiffs present and future economic interests from wrongful interference.” Blackstone v. Cashman 448 Mass. 255, 259 (2007). To make out a successful claim, the plaintiff must prove that (1) he had an advantageous relationship with a third party; (2) the defendants knowingly induced a breaking of the relationship; (3) their interference with the relationship, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendants’ actions. Id. at 260, citing Weber v. Community Teamwork, Inc., 434 Mass. 761, 781 (2001). Harm has been described as a loss of advantage or damage to an economic relationship that resulted directly from the defendant’s conduct. Kurker v. HOI, 44 Mass.App.Ct. 184, 191 (1998).
Casale lists several actions on the part of the defendants that he contends resulted in the failure of the Windspeed transaction and Starbak’s eventual bankruptcy. These include threats made during the so-called “go nuclear” meeting; attempts to gain control over Starbak by soliciting proxies and expanding the board; and refusals to sign the release and indemnity agreements.
Casale’s argument suffers from several infirmities. As an initial matter, Casale contends that the defendants intentionally interfered with Windspeed providing financing to Starbak resulting in Starbak’s bankruptcy.[12] To the extent that the term sheet constituted a prospective contractual or advantageous relationship, it was between Windspeed and Starbak, not Windspeed and Casale. Windspeed was not offering to enter into a contract with Casale. Any compen-sable injury arising out of the alleged interference would be injury to Starbak, not to Casale. While Casale might have been able to avoid liability to Dow if the financing had been successful, that was only afortúnate side effect of the Windspeed deal. Casale had no individual advantageous relationship with Windspeed, only a hope that if the deal went through he would be off the hook for his prior actions that violated the Wage Act. In such circumstances, the only claim that Casale could assert for interference with advantageous relations would be derivative, as a shareholder of Starbak on Starbak’s behalf. See, e.g., Diamondv.Pappathanasi, 78Mass.App.Ct. 77, 87 (2010). The wrong underlying a derivative action is indirect as to the shareholders as it adversely affects them as owners of corporate stock; it is the corporation that suffers the harm. Jackson v. Stuhlfire, 28 *96 Mass.App.Ct. 924, 925 (1990). See also Hurley v. Federal Deposit Ins. Corp., 719 F.Sup. 27, 30 (D.Mass., 1989).
Finally, as a matter of law, Casale fails to satisfy the fourth element of a claim for intentional interference with contractual relations—he must prove improper motive or means. As to improper motive, the plaintiff must set forth evidence to support “proof of the defendant’s ‘actual malice,’ i.e., a ‘spiteful, malignant purpose, unrelated to the legitimate corporate interest.’ ” Brewster Wallcover-ing Co. v. Blue Mt Wallcoverings, Inc., 68 Mass.App.Ct. 582, 608 (2007). “The motivation of personal gain, including financial gain . . . generally is not enough to satisfy the improper interference requirement.” King v. Driscoll, 418 Mass. 576, 587 (1995); United Truck, 406 Mass, at 817. See also Berkshire Armored Car Services, Inc. v. Sovereign Bank of New England, 65 Mass.App.Ct. 96, 102-03 (2002) (conduct motivated by desire to advance a party’s business interest is not improper).
Here, there is no evidence that the defendants sought to harm Casale or Starbak. Compare AdcomProds., Inc. v. Konica Bus. Machines USA, Inc., 41 Mass.App.Ct. 101105 (1996) (defendant motivated by ill will).[13] To the contrary, they were concerned about the value of their common stock in relation to Series A stock; they informed Casale of their concerns; and they represented that they wanted to negotiate more favorable terms for the common shareholders. They were certainly under no obligation to acquiesce in a deal that they believed to be detrimental to their financial interests. By the same token, there is nothing improper about attempting to negotiate a transaction that would result in personal financial gain. See, e.g., King v. Driscoll 418 Mass. 576, 587 (1994). Even if the Court were to find that Casale was injured individually, the record is completely devoid of any evidence that the defendants intended to harm Casale in any way or to prevent him from fulfilling his obligations to Dow.
As to improper means, that the defendants sought to gain a majority of the board for the purpose of preventing a transaction that would decrease their collective ownership by 90% can hardly be characterized as improper means. See, e.g., United Truck Leasing Corp. v. Geliman, 406 Mass. 811, 817 (1990) (no evidence that defendant used threats, misrepresented any facts, defamed anyone, or used any other improper means). There was nothing surreptitious about their conduct; indeed they made their concerns clear from the beginning of the negotiations with Windspeed. Moreover, the deal did not fail because they (Kaufman and Ballantine) held board membership for two days. It failed because they would not vote for the refinancing or sign releases. Certainly, it is understandable that they were reluctant to sign a release that would require them, jointly and severally, to indemnify several individuals from losses incurred should the Windspeed deal be voted down by others over whom they had no control. For the above reasons, summary judgment will be allowed as to Count II.
3. Contribution (Count III)[14]
Casale argues that, as CEO for two days, Kauiman had management of Starbak and is thus jointly liable for Dow’s Wage Act claim under G.L.c. 231B, §1. General Laws c. 231B, §1, however, applies only to joint tortfeasors, that is “two ormore wrongdoers [who] negligently contribute to the personal injury of another by their several acts.” Elias v. Unisys Corp., 410 Mass. 479, 480-81 (1991). G.L.c. 23IB, §1 is inapplicable to the facts alleged.
CONCLUSION AND ORDER
For the reasons recited, Defendants Lawrence Baker, Lawrence Kaufman, and Paul Ballantine’s Motion for Summary Judgment will be ALLOWED as to all counts of Plaintiff Gregory Casale’s Cross Claims and Third-Party Complaint. Final judgment shall enter dismissing all remaining claims.

By order dated July 20, 2011, this Court (Lauriat, J.) entered summary judgment in favor of Dow against Casale; denied Strahle’s motion for summary judgment; and entered summary judgment in favor of Baker dismissing Dow’s claims against him [29 Mass. L. Rptr. 132). After Strahle’s counsel withdrew, the Court ordered Strahle or successor counsel to file an appearance; failure to do so would result in a default judgment. When neither Strahle nor successor counsel filed a notice of appearance by the date set, September 2, 2011, Dow filed a motion for entry of default and default judgment against Strahle, which this Court allowed. Strahle has not since participated in this litigation.

Baker, Kaufman, and Ballantine describe themselves, with Strahle, as the “Founding Team”; Casale describes them as the “Gulfstream Four." Each party disputes the other’s nomenclature for reasons that need not be addressed. The Court will refer to Baker, Strahle, Kaufman, and Ballantine as the defendants unless otherwise specified.

Starbak, Inc. was previously known as Starbak Communications, Inc. It changed its name to Gulfstream Media Corporation d/b/a Starbak on March 15, 2007, and Starbak, Inc. on December 1, 2009.

Nile Bankruptcy Court entered an Order for Relief on March 16, 2010.

Nhe Court need not recite the factual background to Dow’s 'claim under the Wage Act, which is fully set forth in this Court’s July 20, 2011, memorandum.

Casale appealed from that judgment. The appeal has been argued and is under advisement in the Massachusetts Appeals Court.

The first term sheet is not in the summary judgment record. Casale testified in his deposition that there were three term sheets, in October, November, and December 2009. It is unclear exactly how many term sheets Windspeed presented in 2009, or whether at least one was withdrawn prior to being voted on by Starbak’s Board of Directors.

Nhere is evidence in the record that Windspeed sought to solicit a similar release from Series A shareholders, but one was never drafted.

Apparently Windspeed had a commitment from Daniel Ross to be the CEO but, due to the delay resulting from Starbak’s December 24, 2009 rejection of term sheet, Ross accepted another position.

Schmidt’s proxy gave Strahle the right to vote his shares at one undefined meeting. It is not clear that the proxy was adequate to support a vote to increase the number of directors or elect anyone a director. There is nothing in the record that suggests that Casale or Callahan acknowledged Kaufman or Ballantine as directors. Since neither Kaufman or Ballantine *97 after appeared at a board meeting or voted on anything, the extent of their authority was never placed at issue.

There is no evidence in the summary judgment record that the Series A preferred shareholders had obtained control over subsequent rounds of financing when they made their investment in Starbak. Having failed to negotiate control over the interests of the common shareholders in subsequent financings, the Series A shareholders were not in a position unilaterally to decide the degree of dilution that the common shareholders must accept and then assert that it is a breach of fiduciary duly for them not to accept these terms. Indeed, the board rejected the Windspeed deal on December 24, 2009, not because of the issues raised by the common shareholders, but because the Series A shareholders wanted to improve their position. Was that a breach of their fiduciary duty? The fact that Casale had a personal reason to want the financing to succeed—elimination of his potential liability to Dow—does not give him greater rights than the preferred shareholders.

The phrase “contractual or advantageous relationship” comprehends an existing business relationship or contemplated contract of economic benefit. Powers v. Leno, 24 Mass.App.Ct. 381, 384 (1987); see also Blackstone v. Cash-man, 448 Mass. 255, 259 (2007) (advantageous relationship is a present or prospective contract or employment relationship); Owenv. Williams, 322Mass. 356, 361-62 (1948) (plaintiff needs to prove “an existing or even a probable future business relationship from which there is a reasonable expectancy of financial benefit . . .”). The distinction between intentional interference with advantageous relations and intentional interference with contractual relations rests on the existence of a contract. See Buster v. George W. Moore, Inc., 438 Mass. 635, 652 (2003) (intentional interference with advantageous relations requires defendant to induce third party into not continuing business relationship with plaintiff); compare G.S. Enters., Inc. v. Falmouth Marine, Inc., 410 Mass. 262, 272 (1991) (interference with contractual relations requires defendant to induce third party into breaking contract) . The substantive elements are substantially similar and Massachusetts courts have not consistently distinguished between the two. Shqftr v. Steele, 431 Mass. 365, 370 n.10 (2000); Cavicchi v. Koski, 67 Mass.App.Ct. 654, 657 (2006).

As to the so-called “go nuclear” meeting, there is not enough evidence that Kaufman’s statements evinced an intention to harm Starbak, but rather to prevent what he saw as a financially disastrous transaction. See, e.g., Hunneman Real Estate Corp. v. The Norwood Realty, Inc., 54 Mass.App.Ct. 416, 428 (2002).

Casale has waived his claim for contribution against Baker and Ballantine, and seeks to recover only from Kaufman.